## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

KINDALL LEIGH DONEHUE and ANDREW JOSEPH DONEHUE, husband and wife, )
)
)
)
        Plaintiffs, )
)
v. )
)
APACHE CORPORATION, )
)
        Defendant. )

Case No. CIV-21-00710-D

## ORDER

Before the Court is Defendant Apache Corporation's Motion for Summary Judgment [Doc. No. 40]. Plaintiffs have responded in opposition [Doc. No. 54] and Defendant has replied [Doc. No. 61]. The matter is now at issue.

## INTRODUCTION

The Donehues purchased a tract of land in the Coffee Creek Hills addition in Edmond, Oklahoma in 2017 and drilled a water well for their residential use. But they quickly discovered a problem: the water being produced from the well contained contaminants that made it unsuitable for drinking and other domestic uses. They drilled a second water well, but it too has shown signs of contamination.

The Donehues blame oil and gas operations occurring from the 1950s to 1980s for the groundwater contamination. Their theory is that operators were storing produced saltwater in unlined pits that allowed contaminants to slowly leach into the groundwater below. Plaintiffs seek to hold Apache – one of several operators involved in this area –

liable for the contamination. Apache acquired and briefly operated producing wells in the area in the mid-80s but ceased its operations decades before the Donehues purchased their property.

Plaintiffs assert claims against Apache for public nuisance, private nuisance, damage to real property, trespass, negligence, unjust enrichment, and constructive fraud. They contend that Apache is directly liable for its own acts or omissions and as the successor in interest to MidCon Central Exploration Company, the entity from whom Apache acquired the assets.

Apache moves for summary judgment on all claims. Apache argues that there is no evidence showing that it utilized unlined pits (or otherwise put contaminants into the ground) during its brief tenure as operator of the wells, that the undisputed facts establish that it cannot be liable for the actions of predecessor companies, and that Plaintiffs have no cognizable claim for nuisance damages given that they purchased the property decades after the contamination took place.

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id*. at 255. Where the undisputed facts establish that a plaintiff cannot prove an essential element of a

cause of action, the defendant is entitled to judgment on that cause of action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

At the summary judgment stage, the court's role is not "to weigh the evidence and determine the truth of the matter," but to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 249–52. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## FACTUAL BACKGROUND

In 1985, Harper Oil Company changed its name to MidCon Central Exploration Company. Def.'s Br. ¶ 10. In 1986, Apache entered into a self-styled "Asset Purchase Agreement" with MidCon. Def.'s Ex. 5. The Agreement lists Apache (and two other entities) as the purchasers, MidCon (and several other entities) as the sellers, and Occidental Petroleum Corporation ("Oxy") as the parent of the sellers. *Id.* The Agreement provides that the sellers will convey all their assets – except cash, stocks, and specifically excluded items – to Apache for a purchase price of $440,000,000.00. *Id.* The Agreement further provides that Oxy and the sellers will indemnify the purchasers for any losses arising from liabilities of the sellers relating to the assets. *Id.* The Agreement references several other documents that relate to the transaction, including a document showing that Oxy controlled the escrow account for the payment. Pl.s' Br. ¶ 6. Some employees of the sellers, including at least one employee at the vice president level, transitioned to Apache as part of the overall transaction. Pls.' Br. ¶ 10.

In 1987, after the execution of the Asset Purchase Agreement, MidCon assigned its interests in other leases to another entity. Def.'s Br. ¶ 9. MidCon filed a certificate of dissolution in 1997. *Id.* There is no evidence in the record indicating that any of MidCon's officers, directors, or shareholders were officers, directors, or shareholders of Apache at the time of the transaction.

Pursuant to the Asset Purchase Agreement, MidCon assigned to Apache its interest in mineral leases covering areas in the Northwest quarter of Section 15, Township 14 North, Range 2 West and in the South half of Section 10, Township 14 North, Range 2 West. Def.'s Br. ¶¶ 1,7. Oil and gas activity in these areas was nothing new – leases covering these lands were first executed with various entities between 1948 and 1953 and a saltwater disposal well was drilled on the Section 15 lands in 1953 (and eventually plugged in 2003). *Id.* at ¶¶ 1-2. The Section 10 lands and Section 15 lands are in or near the area that is now the Coffee Creek Hills addition in Edmond, Oklahoma.

As a result of acquiring MidCon's interest in the Section 10 and Section 15 leases, Apache took over as operator of producing oil wells on these lands in 1986. *Id.* at ¶ 8, Def.'s Ex. 9. Apache assigned its interests in the Section 10 lands to another entity in 1987 and assigned its interests in the Section 15 lands to another entity in 1988. Def.'s Br. ¶¶ 11-12.

In 2017 (nearly 30 years after Apache last operated any wells in the area), Plaintiffs purchased their property, which is located within the Section 15 lands. *Id.* at ¶ 13. Plaintiffs drilled a water well for their residential use, but soon discovered that the water was polluted

by contaminants. Pl.'s Br. ¶ 8. A second water well was drilled, and it has shown signs of increasing contamination. *Id.*

There is more to this story, but the remaining facts (or at least the inferences that should be drawn from them) are disputed. Plaintiffs assert that Apache's predecessor companies – specifically MidCon and Harper – utilized earthen pits to store saltwater that was produced by oil wells operating on the Section 10 and Section 15 lands. Pls.' Br. ¶ 2. The pits were not located directly on what is now Plaintiffs' property but were in the surrounding area. *Id.* at ¶ 3. Plaintiffs contend that these pits were unlined, and that saltwater stored in the pits caused the groundwater contamination now impacting their water wells. *Id.* at ¶¶ 2, 5. They further contend that when Apache acquired the leases in 1986, it would have been customary to conduct an assessment to identify areas of environmental concern, that some of the pits remained on the land during Apache's operations, and that contaminants from the pits continued to impact groundwater during Apache's tenure. *Id.* at ¶¶ 2-6. Apache disputes these statements, but Plaintiffs have cited to evidence in support of these contentions.[1] There is no evidence in the record indicating that Apache actively used the pits.

---

[1] In support of their factual statements, Plaintiffs cite to the reports or testimony of three expert witnesses as well as a 1952 order from the Oklahoma Corporation Commission noting that "saltwater is being disposed of in earthen pits and there is danger of surface pollution resulting therefrom." Pl.'s Ex. 17. Apache objects to the use of the 1952 order because it was not produced in discovery. However, it was discussed during an expert witness deposition, Dick Depo, Pl.s' Ex. 12, 114:1-18, and Apache therefore had notice of the document and its contents. Apache has also moved to exclude certain opinions of Plaintiffs' three expert witnesses. *See* Apache's Motion to Exclude Certain Opinions of Plaintiffs' Proposed Experts Randall Grip, John Paul Dick, and Bert J. Smith [Doc. No. 51]. In a separate order, the Court granted in part and denied in part Apache's motion [Doc.

# DISCUSSION

## A. Nuisance Claims

Plaintiffs assert claims against Apache for both public and private nuisance. The particular issue raised by Apache's summary judgment motion is not whether the alleged groundwater contamination qualifies as a public or private nuisance, but instead, whether Apache be held liable for it. Apache contends that it is not liable because there is no evidence that it used the pits and the alleged contamination occurred decades before Plaintiffs purchased their property. Plaintiffs counter that, even if Apache did not use the pits, it may nevertheless be held responsible for the contamination if it knew (or should have known) that predecessor operators used unlined pits to dispose of produced water.

### 1. Public Nuisance

Oklahoma has codified a successive owner's liability for the maintenance of a nuisance:

> Every successive owner of property who neglects to abate a continuing nuisance upon, or in the use of such property, created by a former owner, is liable therefor in the same manner as the one who first created it.

---

No. 67]. Setting aside the excluded opinions of Plaintiffs' experts, there is evidence in the record indicating that pits were present on the property during Apache's tenure, Smith Depo, Pl.'s Ex. 162:17-163:22; 172:6-17; that unlined pits were customarily used in this area during the 1950s-70s, Dick Report, Def.'s Ex. 25, p. 5, Dick Depo, Pl.s' Ex. 12, 114:1-18; that unlined pits are the source of the groundwater contamination, Smith Report, Def.'s Ex. 23, p. 4; and that it would have been customary to conduct an environmental assessment of the area at the time Apache acquired the assets, including a review of historic aerial images. Smith Depo, 225:13-226:3, 242:8-249:12; Dick Report, Def.'s Ex. 25, p. 7.

Okla. Stat. tit. 50, § 5. Two early Oklahoma Supreme Court cases discuss the scope of this successor liability: *Daniels v. St. Louis & S.F.R. Co*., 128 P. 1089 (Okla. 1912), and *Chicago, R.I. & P. Ry. Co. v. Morton*, 157 P. 917 (Okla. 1916).

In *Daniels*, 128 P. at 1089, a railroad company built a road outside of its right-of-way and created a borrow pit in the process. The company then sold the road to the defendant. *Id.* After the plaintiff's horses became mired in the pit, he sued the defendant, claiming it was liable for the nuisance by its purchase of the road. *Id.* In considering whether the defendant could be liable for a nuisance that preexisted its purchase of the property, the Oklahoma Supreme Court held the following:

> The law is that where real estate is bought after a nuisance, such as the borrow pit is claimed to have been, is created, the purchaser cannot be held liable for damages occasioned by the nuisance until his attention has been called to it and he has been asked to abate it. The rule is different where the purchaser uses or repairs the nuisance. But in cases of mere passive nuisance the purchaser must be notified. He has a right to presume that his grantor was in the lawful use of his land, and cannot be held liable for allowing things to remain as they are until notice is brought to him.

*Id.* at 1090. Because the defendant had not used the pit and "had no notice of its dangerous character, or that it constituted a nuisance," the court ruled that the defendant was not liable for the damages caused by the nuisance. *Id.*

*Morton*, 157 P. at 917, built on *Daniels'* holding. The plaintiff in *Morton* alleged that a railway track, bridge, and embankment were causing a creek to overflow and flood his land. *Id.* These features were constructed by a railroad, sold to another company, and then leased to the defendant, who continued to operate the railroad. *Id.* at 918. As a mere lessee who only maintained the nuisance, defendant argued that it could not be held

responsible for damages unless it had notice of the nuisance and a request to correct it. *Id.* at 920. The Oklahoma Supreme Court concluded that "knowledge of the existence and hurtful character of the nuisance, or knowledge of facts from which by the exercise of reasonable care and foresight such knowledge would have been acquired, renders a successive owner or lessee liable for the damages occasioned by such nuisance, and that no request by the party injured for an abatement of the nuisance is necessary in order to give rise to a cause of action." *Id.* at 920-921. The Oklahoma Supreme Court considered this holding to be "in harmony" with the holding in *Daniels*. *Id.*

Apache interprets these cases as establishing a distinction between successive owners that continue to use or maintain the nuisance (like in *Morton*) and successive owners that do not use or maintain the nuisance (like in *Daniels*). In the latter case, Apache argues, the defendant is not liable for the pre-existing nuisance unless it received a request to abate the nuisance. Apache contends that it is like the defendant in *Daniels* and, because it did not use the pits or receive an abatement request, it is not liable as the successive operator or lessee.

Plaintiffs argue that this is an exceedingly narrow interpretation and point to more recent case law suggesting that the crucial issue is whether the successor had knowledge of the nuisance. In *Union Texas Petroleum Corp. v. Jackson*, 909 P.2d 131 (Okla. Civ. App. 1995), the Oklahoma Court of Civil Appeals discussed successor liability for a nuisance in the context of an appeal from an order issued by the Oklahoma Corporation Commission. The court explained that Okla. Stat. tit. 50, § 5 "provides for liability of successor owners or lessees if the owner or lessee has or should have knowledge of the

existence of the nuisance and of its liability to cause injury." *Id.* at 141. It then went on to summarize *Daniels* and *Morton*. *Id.*

The Tenth Circuit reiterated this position in *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1026 (10th Cir. 2007). There, BNSF and Grant owned adjacent tracts of property that were previously the location of an oil refinery that produced a tar-like material ("TLM") as a waste product. *Id.* at 1018. BNSF brought claims for public and private nuisance after TLM located on Grant's property migrated onto BNSF's land. *Id.* The district court ruled that Grant could not be liable for the TLM migration as a successive landowner because BSNF never demanded that he abate the nuisance. *Id.* at 1018. The Tenth Circuit reversed. *Id.* at 1026.

The Tenth Circuit explained that Okla. Stat. tit. 50, § 5 "provides for liability of successor owners who have or should have knowledge of the existence of the nuisance and of its liability to cause injury." *Id.* at 1026. Citing to *Morton*, the Tenth Circuit then noted that "[d]espite Grant's arguments to the contrary, the Oklahoma Supreme Court held long ago that an injured landowner need not request abatement from the tortfeasor responsible for a nuisance prior to bringing a nuisance action in instances where the tortfeasor knew or should have known of the nuisance." *Id.* Because there was evidence that Grant "had constructive or actual knowledge that TLM on his property constituted a nuisance to BNSF[,]" the Tenth Circuit held that it was improper to grant the defendant judgment as a matter of law. *Id.*

These authorities indicate that a successor may be held liable for a nuisance, even without an abatement request, if the successor had, or should have had, knowledge of the

nuisance and its ability to cause harm. Although Apache suggests otherwise, this interpretation is entirely consistent with *Daniels* and *Morton*.

In *Daniels*, an abatement request was necessary before imposing liability because the defendant neither used the pit involved nor had any prior knowledge that the pit was a nuisance. The court in *Daniels* specifically noted that no one knew of the "boggy character" of the pit, the pit was not "a nuisance per se," and the defendant "had no notice of its dangerous character." *Daniels*, 128 P. 189-90. Thus, *Daniels* does not foreclose imposing successor liability where a defendant, although not actively using the nuisance, nevertheless has knowledge of its dangerous character. *Morton* then makes explicit that an abatement request is not always necessary. *Morton*, 157 P. at 920-21. Although the defendant in *Morton* was maintaining the nuisance, the court's rationale for imposing liability was on the successor's knowledge of the nuisance. *Morton*, 157 P. at 920 ("[I]f the grantee or lessee have knowledge of the existence of the nuisance and of its liability to cause injury, he would stand in the same position as the one who created it and would therefore be held liable in the same manner."). Thus, as explained by the Tenth Circuit in *Grant*, under Okla. Stat. tit. 50, § 5, a successor who neglects to abate a continuing nuisance created by a former owner may be held liable if the successor had actual or constructive knowledge of the nuisance and its liability to cause injury.

The nuisance involved here is the allegedly unlined pits that predecessor operators used to dispose of produced water. There is no evidence that Apache used the pits or that Apache added contaminants to the pits. However, accepting Plaintiffs' facts and viewing all reasonable inferences in their favor, there is minimally sufficient evidence from which

a reasonable juror could conclude that Apache should have known of the existence of the pits and the risk of groundwater contamination. Plaintiffs have presented evidence that an environmental assessment would have been customary at the time Apache acquired the assets, including a review of historic aerial images. Although there is no evidence showing precisely what the area looked like at the time Apache acquired the leases, there is evidence indicating that pits were visible on historic aerial images, that pits were typically unlined during the decades that preceded Apache's operatorship, and that some pits were still present even after Apache assigned the leases. Further, Plaintiffs' expert testified that the pre-existing contamination from the pits continued to pollute the groundwater during Apache's operations. Accordingly, the Court finds that a genuine dispute of material fact as to whether Apache knew or should have known of the existence of unlined pits and their ability to cause contamination precludes summary judgment on Plaintiffs' public nuisance claim.

### 2. Private Nuisance

Under Oklahoma law, a "nuisance consists in unlawfully doing an act, or omitting to perform a duty, which…[a]nnoys, injures or endangers the comfort, repose, health, or safety of others." Okla. Stat. tit. 50, § 1. A public nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal." *Id*. at § 2. Every other form of nuisance is a private nuisance. *Id.* at § 3.

Apache asserts that it is entitled to summary judgment on Plaintiffs' private nuisance claim because an action for private nuisance is intended to resolve disputes

between neighboring landowners, rather than successors and predecessors. Although the statutes noted above do not appear to limit private nuisance claims in this manner, there is case law supporting Apache's position. In *Moore v. Texaco, Inc*., 244 F.3d 1229 (10th Cir. 2001), the Tenth Circuit rejected a private nuisance claim between successive landowners. The plaintiff purchased a property that had previously been owned by Texaco and, after discovering contamination from crude oil and other products, sued Texaco for nuisance. *Id.* at 1230-31. With respect to the private nuisance claim, the Tenth Circuit held that "[i]t is likely that Oklahoma would reach the same conclusion reached by nearly every other court to consider the issue: that an action for private nuisance is designed to protect neighboring landowners from conflicting uses of property, not successor landowners from conditions on the land they purchased." *Id.* at 1232. *See also Bristow First Assembly of God v. BP p.l.c*., 210 F. Supp. 3d 1284, 1294 (N.D. Okla. 2016) (citing *Moore* in support of dismissal of private nuisance claim by successor landowner).

Plaintiffs contend that *Moore* is distinguishable because the defendant here is a former lessee, not a landowner/seller of real property. A similar argument was recently rejected by a court in this district. *Blocker v. ConocoPhillips Co*., 380 F. Supp. 3d 1178, 1185 (W.D. Okla. 2019). In *Blocker*, the court noted that *Moore's* holding relied on *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303 (3d Cir. 1985), in which "the Third Circuit explained that the historical role of private nuisance law was to provide a means of resolving 'conflicts between neighboring, contemporaneous land uses.'" *Blocker*, 380 F. Supp. 3d at 1185 (quoting *Phila. Elec. Co.*, 762 F.2d at 314). *Blocker* then concluded that

the same considerations precluding a private nuisance claim against a former property owner, as articulated in *Philadelphia Electric Co.*, would substantially apply to a former lessee. Neither presents the danger of a contemporaneous, discordant use of the land, and the purchasing landowner would, in either case, be protected by the ability to inspect the land prior to purchase.

*Id.* at 1185-86. The Court agrees with *Blocker* that *Moore's* holding applies to a former lessee as well as a former owner.

Further, the Court is not persuaded that this case is distinguishable because none of the pits were located on land that is now Plaintiffs' property. Both the use of the pits and Apache's operations occurred decades prior to Plaintiffs' ownership. Accordingly, Plaintiffs do not seek to abate a "contemporaneous, discordant use of the land," *Blocker*, 380 F. Supp. 3d at 1185, but instead seek relief related to "conditions on land they purchased." *Moore*, 244 F.3d at 1232. Following *Moore's* holding, this is not the sort of claim private nuisance is intended to remedy. Although Plaintiffs cite to several cases that they contend support their position, these cases involve claims against former lessees for ongoing activities, not activities that ceased decades prior to the plaintiff's acquisition of the land.

Given the Tenth Circuit's conclusion that Oklahoma law precludes a private nuisance claim between successive owners, the Court finds that Apache is entitled to summary judgment on the private nuisance claim.

### 3. Damages

Apache additionally moves for summary judgment on the ground that Plaintiffs cannot recover monetary damages for a permanent injury that arose before they purchased

the property. Under Oklahoma law, nuisance "damages are determined by whether the injury suffered is permanent or temporary, rather than whether the cause of injury is permanent or temporary." *Grant*, 505 F.3d at 1027. "Permanent injury to property occurs when it 'may not be successfully repaired so that it will be substantially in as good a condition as it was before the injury.'" *Thompson v. Andover Oil Co.*, 691 P.2d 77, 82 (Okla. Civ. App. 1984) (quoting *Keck v. Bruster*, 368 P.2d 1003, 1005 (Okla. 1962)). Where the injury is permanent, "the measure of damage is the difference between the actual value immediately before and immediately after the damage is sustained." *Schneberger v. Apache Corp.*, 890 P.2d 847, 849 (Okla. Civ. App. 1994) (quoting *Const. Co. of Oklahoma v. Thomas*, 347 P.2d 649, 651 (Okla. 1959)). Where the injury is temporary, meaning that the property can be restored or the nuisance abated, "the measure of damage is the reasonable cost of repairing the damage and restoring it to its former condition," but not to "exceed the depreciated value of the land itself." *Id.*

Apache asserts that the injury Plaintiffs complain of – contamination to the groundwater – is permanent because they have put forth no evidence showing that the contamination can be reasonably abated. Apache therefore argues that Plaintiffs' damages are limited to the difference between the value of the land before and after the contamination. However, because Plaintiffs purchased their property after the pollution occurred, there can be no diminution in value attributable to the pollution. Plaintiffs dispute that their injury is permanent and argue that the nuisance can be abated by connecting to a public water supply.

Regardless of whether the injury is permanent or temporary, entering summary judgment on this issue is not appropriate at this time. Apache seeks a ruling that Plaintiffs cannot recover monetary damages based on water pollution occurring before their purchase. However, at least some of the damages Plaintiffs seeks are not subject to a limitation based on the diminished land value. *See Thompson*, 691 P.2d at 83 ("The personal inconvenience, annoyance, and discomfort to a property owner caused by the maintenance of a nuisance is a separate and distinct element of damage."); *Cities Serv. Oil Co. v. Merritt*, 332 P.2d 677, 687 (Okla. 1985). ("Also, in this case, plaintiff is entitled to reimbursement for emergency expenditures hereinbefore mentioned made to minimize her damages."). Accordingly, summary judgment as to the limit of Plaintiffs' monetary damages is not warranted. *See Davis v. Shell Oil Co.*, 795 F. Supp. 381, 385 (W.D. Okla. 1992) ("Plaintiffs assert several damages theories, some of which have no land value limitation. Thus to enter an order at this time limiting damages would be inappropriate."); *Blocker v. ConocoPhillips Co.*, 380 F. Supp. 3d 1178, 1187 (W.D. Okla. 2019) (reserving ruling on limiting nuisance-related damages because it is more appropriately addressed through jury instructions).

### B.  Non-Nuisance Claims

In addition to their nuisance claims, Plaintiffs assert claims for negligence, trespass, constructive fraud, unjust enrichment, and damage to real property.[2] Plaintiffs contend that

---

[2] Plaintiffs' Complaint asserts a separate cause of action for damage to real property. Apache moves for summary judgment on this claim, arguing that there is no evidence showing that Apache damaged Plaintiffs' real property. Plaintiffs have not specifically responded to this argument. Given Plaintiffs' lack of response, and for substantially the

Apache's own acts or omissions render it directly liable for these claims. Additionally, they contend that Apache acquired MidCon via the 1986 Asset Purchase Agreement and may therefore be held liable as the successor in interest to MidCon. Apache argues that Plaintiffs cannot establish its direct liability for any claims and that the undisputed facts show that Apache is not liable as a successor. After discussing the direct liability claims, the Court will turn to the issue of successor liability.

### 1.  Negligence

Plaintiffs contend that Apache acted negligently by failing to properly manage the pits and warn of the contamination. Apache contends that it is entitled to summary judgment on this claim because there is no evidence showing that Apache used unlined pits, and Plaintiffs therefore cannot show that Apache breached a duty or proximately caused their injuries.

"The elements of the tort of negligence are 1) a duty of care owed by defendant to plaintiff, 2) defendant's breach of that duty, and 3) injury to plaintiff caused by defendant's breach of that duty." *Lowery v. Echostar Satellite Corp.*, 160 P.3d 959, 964 (Okla. 2007). With respect to oil and gas operations specifically, Oklahoma courts have recognized that operators have "a duty to safely dispose of salt water generated by [a] lease." *Cumberland Operating Co. v. Ogez*, 769 P.2d 105, 108 (Okla. 1988). Here, however, Plaintiffs have not come forward with any evidence showing that Apache itself improperly disposed of contaminants or used the pits. Further, although some Oklahoma courts have suggested

---

same reasons discussed *infra*, the Court finds that Apache is entitled to summary judgment on this claim with respect to Apache's direct liability.

that an operator has a duty to warn of contamination, those cases involved claims asserted against an operator who contributed to the pollution and failed to remediate or warn of contamination at the time it occurred. *See N.C. Corff P'ship, Ltd. v. OXY USA, Inc*., 929 P.2d 288, 296 (Okla. Civ. App. 1996) (stating that duty to warn of contamination does not extend to matters of which operator is unaware); *Gulf Oil Corp. v. McCoy*, 416 P.2d 948, 952 (Okla. 1966) (operator's knowledge of pollution it caused was relevant to punitive damages). Plaintiffs have failed to identify any case law or make any persuasive argument that a lessee has a duty to a future landowner to remediate pits that it did not use or warn of preexisting contamination. Plaintiffs did not purchase their property until well after Apache ceased its operations in the area and they have not identified any act or omission of Apache that caused contaminants to be put into the ground. Accordingly, Apache is entitled to summary judgment on Plaintiffs' direct negligence claim. *See Moore*, 244 F.3d at 1233 (affirming summary judgment on negligence claim under Oklahoma law where the plaintiff cited "no Oklahoma authority that would make a landowner liable to a subsequent landowner for negligently polluting land prior to the sale").

Plaintiffs' negligence per se claim fails for similar reasons. To establish negligence per se, a plaintiff must demonstrate that their injury was caused by a statutory violation, was of the type intended to be prevented by the statute, and that the injured party was of the class intended to be protected by the statute. *Howard v. Zimmer, Inc*., 299 P.3d 463, 467 (Okla. 2013). Plaintiffs cite Okla. Stat. tit. 52, § 296 in support of their negligence per se claim. This statute prohibits draining waste from oil and gas wells into improper receptacles or allowing salt water to flow over the land. However, as noted previously,

Plaintiffs' have not come forward with any evidence showing that Apache (as opposed to its predecessors) improperly disposed of any material or allowed saltwater to flow over the land. Plaintiffs have therefore not shown that any statutory violation by Apache caused their injury. Apache is therefore entitled to summary judgment on this claim as well. *See Moore*, 244 F.3d at 1233 (affirming summary judgment as to negligence per se claim because "there is no proof that [the defendant] actually violated any statute or caused any pollution").

### 2.  Trespass

Apache also contends that it is entitled to summary judgment on Plaintiffs' trespass claim because there is no evidence that Apache invaded Plaintiffs' property. A "[t]respass involves an actual physical invasion of the real estate of another without the permission of the person lawfully entitled to possession." *Fairlawn Cemetery Ass'n v. First Presbyterian Church*, 496 P.2d 1185 (Okla. 1972). "Stated another way, a trespasser is one who enters upon the property of another without any right, lawful authority, or express or implied invitation, permission, or license, not in the performance of any duty to the owner or person in charge or on any business of such person, but merely for his own purposes, pleasure, or convenience, or out of curiosity." *Id.*

Plaintiffs' trespass claim is premised on Apache's contamination of the groundwater and its failure to remove contaminants from the groundwater, but they have no evidence showing that Apache put contaminants into the ground. Accordingly, they have not shown that Apache invaded their land or failed to remove any item that it placed there. Apache is therefore entitled to summary judgment on the trespass claim.

### 3.   Constructive Fraud

Constructive fraud involves a "breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him." Okla. Stat. Ann. tit. 15, § 59(1). Accordingly, "a claim for constructive fraud requires a showing that the defendant owed some form of duty to the plaintiff, such as a fiduciary duty or a duty based upon a confidential relationship or a special relationship of trust." *Roberts Ranch Co. v. Exxon Corp.*, 43 F. Supp. 2d 1252, 1259 (W.D. Okla. 1997) (quotation omitted).

In *N.C. Corff P'ship, Ltd,* 929 P.2d at 295-296, the Oklahoma Court of Civil Appeals indicated that a constructive fraud claim based on an oil and gas operator's failure to warn of pollution could proceed where the operator had actual knowledge of contamination at a particular site.[3] Although recognizing that a constructive fraud claim based on undisclosed pollution may be viable, the court also approved of the plaintiffs' admission that a constructive fraud claim "does require, at the least, proof that the parties involved had a 'special' relationship by which it is clear that they were not dealing with one another at arm's length." *Id.* at 295-296.

Here, Plaintiffs have failed to show that any relationship existed between Apache and Plaintiffs. Assuming Apache knew that unlined pits had contaminated the groundwater, Plaintiffs have not shown that they were under a duty to report it to Plaintiffs, who did not

---

[3] In *N.C. Corff*, 929 P.2d at 291, the plaintiff's ownership of the contaminated property overlapped with the defendant's activities.

purchase their property until long after Apache ceased its operations. Accordingly, Apache is entitled to summary judgment on this claim.

### 4. Unjust Enrichment

As an alternative to their legal claim for damages, Plaintiffs also pursue an unjust enrichment claim. Unjust enrichment "describes a condition resulting from the failure of a party to make restitution in circumstances where it is inequitable." *N.C. Corff P'ship*, 929 P.2d at 295. To recover for unjust enrichment, "there must be enrichment to another coupled with a resulting injustice." *Id.* (quotation omitted). In considering an unjust enrichment claim based on pollution caused by oil and gas operators, the Oklahoma Court of Civil Appeals indicated that the plaintiff "must prove not only that [the defendant] is responsible for contaminating the property, but also that the contamination will not be abated, and that [the defendant] in fact has received an economic benefit thereby." *Id.*

Although Apache argues to the contrary, Plaintiffs have presented evidence as to each of these points. In *Grant*, 505 F.3d at 1030, the Tenth Circuit reinstated the plaintiff's unjust enrichment claim after reversing the district court's dismissal of his public and private nuisance claims. Similarly, here, because there is a material factual dispute precluding summary judgment on the public nuisance claim, Plaintiffs may be able to prove that Apache is responsible (at least as a successor) for the contamination and that they benefited by not having to complete any remediation during their operatorship. *See Blocker*, 380 F. Supp. 3d at 1189 (denying summary judgment on unjust enrichment claim involving historic pollution from oil and gas operations). Plaintiffs have also put forth some evidence by way of expert testimony indicating that cleaning the polluted water is not a

viable option. *See* Smith Depo, Pl.s' Ex. 15, 147:14-148:24. Summary judgment on the unjust enrichment claim is therefore not appropriate.

### 5. Successor Liability

In addition to their direct liability claims against Apache, Plaintiffs seek to hold Apache liable for the acts of MidCon and Harper, the companies that previously held the leases on the Section 10 and Section 15 lands. Plaintiffs contend that Apache acquired MidCon from its parent company, Oxy, as a result of the 1986 Asset Purchase Agreement and is therefore responsible for MidCon's actions. Apache argues that, under Oklahoma's successor liability rules, the undisputed material facts show that Apache is not MidCon's successor.

Generally, "where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor." *Pulis v. United States Elec. Tool Co*., 561 P.2d 68, 69 (Okla. 1977). An exception arises when:

1) there is an agreement to assume such debts or liabilities;
2) there is a consolidation or merger of the corporations;
3) the transaction was fraudulent in fact; or
4) the purchasing corporation is a mere continuation of the selling company.

*Crutchfield v. Marine Power Engine Co*., 209 P.3d 295, 300–01 (Okla. 2009) These exceptions exist "to prevent the shareholders, officers, and directors of a corporation from eluding its debts and liabilities while maintaining control over its assets." *Id*. at 300. Here, Plaintiffs allege that the "mere continuation" exception is applicable. This exception "covers a re-organization of a corporation." *Id*. To determine whether a purchasing corporation is a "mere continuation" of a selling company, Oklahoma courts consider

"whether there is a common identity of directors, officers, and stockholders before and after the sale, whether there was good consideration for the sale, and whether the seller corporation continues to exist in fact." *Crutchfield*, 209 P.3d at 301.

As to the first factor, Apache has presented a declaration from the corporate secretary of Apache's parent company indicating that none of the individuals identified in various MidCon and Harper records is listed as a director or officer of Apache from 1986 (when Apache acquired the assets) through 1988 (when Apache assigned the assets).[4] Plaintiffs counter that MidCon's high level officers were also officers of Oxy and it is unsurprising that they would remain with Oxy after Apache acquired MidCon. Plaintiffs also argue that documents attached to the Asset Purchase Agreement show that some MidCon employees, including one at the level of vice president, transitioned to Apache as part of the sale. However, in evaluating whether a purchaser may be liable as the mere continuation of the seller, "[t]he test is not the continuation of the business operation, but the continuation of the corporate entity." *Pulis*, 561 P.2d at, 71.

As to the second factor, the Asset Purchase Agreement reflects that a significant sum was paid to the sellers in exchange for the assets. Plaintiffs respond that certain features of the transaction – specifically Oxy's control of the escrow account – suggest that the purchase price was actually paid to Oxy to acquire its subsidiaries.

As to the final factor, Apache has presented MidCon's Certificate of Dissolution showing that it continued to exist and did not formally dissolve until 1997. Apache also

---

[4] Because summary judgment is denied on this issue, it is unnecessary to resolve Plaintiffs' evidentiary objection to this declaration.

offers a document showing that MidCon assigned certain oil and gas leases to another entity in 1987. But this document raises more questions than answers. It identifies MidCon as the assignor and Covington Oil Company, Inc. as the assignee of the interests listed in an attached exhibit. Def.'s Ex. 10. The document then indicates that the assignment is subject to the terms of an agreement between Apache and Covington. *Id.* Further, the exhibit outlining the leases to be assigned provides that the assignment is "between APACHE CORPORATION and COVINGTON OIL COMPANY, INC." *Id.* (capitalization in original). Neither party has addressed why Apache is included on an assignment purporting to be between MidCon and Covington Oil Company.

In considering whether summary judgment on this issue is appropriate, the Oklahoma Supreme Court's decision in *Pulis*, 561 P.2d at 71, is instructive.[5] *Pulis* recognized that "the continued existence of the seller corporation after the sale is a strong indication that the transaction did not result in the mere continuance of the seller corporation." *Id.* Nevertheless, the Court held that it was inappropriate to rule for the purchaser as a matter of law where "[t]he record was void of any specific information about the seller corporation's business activities after the sale[,]" such as "who managed the

---

[5] The Oklahoma Supreme Court considered the mere continuation exception more recently in *Crutchfield,* 209 P.3d at 299, which involved a garnishment proceeding. Following a hearing, the trial court ruled that a purchasing entity was the mere continuation of the seller. *Id.* The Oklahoma Supreme Court held that there was insufficient evidence upon which to make this determination where it was demonstrated that there were no common directors or officers, there was no showing as to common shareholders, it was undisputed that the assets were sold for adequate consideration, and it was undisputed that the seller did not sell all of its assets, although it was unclear how long and to what extent the seller continued to exist or operate after the sale. *Id.* at 303.

corporation after the sale, or how many employees it had, how active its business was, where it was located, what assets it possessed, who owned it, or how long it remained in business." *Id.* at 72.

The Tenth Circuit considered *Pulis* in *Flores v. U.S. Repeating Arms Co.*, 19 F. App'x 795, 798 (10th Cir. 2001) (unpublished). There, the plaintiff sought to hold a company that purchased a majority of the seller company's assets liable under the mere continuation exception. *Id*. at 796-97. The trial court granted summary judgment to the purchaser after it presented undisputed evidence showing that the seller continued to exist after the sale with assets in excess of $1,000,000, there was independent management between the entities, different employees, and no common officers or directors. *Id*. at 798. On appeal, the plaintiff argued that *Pulis* precluded summary judgment because there was no evidence related to the seller's business activities after the sale. *Id.* at 798. The Tenth Circuit affirmed because, unlike in *Pulis*, the record contained information concerning the activities of the seller that the plaintiffs did not dispute. *Id.*

Although the issue is close, the Court concludes that the record in this case is more like that in *Pulis* than in *Flores*. Apache has not presented evidence concerning the activities or management of MidCon after the asset sale, other than an assignment which also identifies Apache as somehow involved in the transaction. Here, like in *Pulis,* 561 P.2d at 72, "it is possible that after the sale of the seller corporation, it existed in form only, with little or no actual function." Further, although there is evidence showing a lack of common directors and officers between the companies and that good consideration was paid, Plaintiffs have, unlike in *Flores*, responded to Apache's evidence with conflicting

facts and inferences. At the summary judgment stage, all reasonable inferences that may be drawn from the factual record must be construed in the light most favorable to the non-movant. Accordingly, the Court finds that there is a genuine factual dispute that precludes summary judgment regarding whether Apache is a successor in interest to MidCon.

### C. Punitive Damages

Apache also seeks summary judgment on Plaintiffs' request for punitive damages. Typically, "punitive damages are a remedy, not a claim subject to dismissal." *Sab One, Inc. v. Travelers Indem. Co. of Connecticut*, No. CIV-14-1089-R, 2014 WL 6687310, at *1 (W.D. Okla. Nov. 26, 2014). *See also Evans v. Liberty Nat. Life Ins*. Co., No. 13-CV-0390-CVE-PJC, 2015 WL 1650192, at *10 (N.D. Okla. Apr. 14, 2015) (explaining that summary judgment on punitive damages request "is inappropriate" because punitive damages are a type of damages and not an underlying claim for relief). Further, Oklahoma courts have found punitive damages to be appropriately awarded in cases involving pollution from oil and gas assets. *See Nichols v. Burk Royalty Co.,* 576 P.2d 317, 322 (Okla. 1977); *Merritt*, 332 P.2d at 688. Accordingly, this aspect of Apache's summary judgment motion is denied.

### CONCLUSION

For the reasons explained above, Defendant Apache Corporation's Motion for Summary Judgment [Doc. No. 40] is GRANTED in part and DENIED in part. Apache is granted summary judgment on Plaintiffs' private nuisance, damage to real property, constructive fraud, direct negligence, and direct trespass claim. Summary judgment is denied as to the claims for public nuisance and successor liability.

IT IS SO ORDERED this 3rd day of January, 2023.

_____

TIMOTHY D. DeGIUSTI
Chief United States District Judge